Commodity Futures Trading CommissionvEquity Financial Group. Equity Futures Trading CommissionvEquity Financial Group My name is Robert W. Shimer. I'm a counsel of record for the Equity Financial Group, the appellant. And as a member of this bar, I also represent myself pro se in this matter. I reserve four minutes of my time for rebuttal. As the appellants pointed out in several various motions before the district court, there are several, in the various arguments we presented in support of two separate motions for summary judgment in April, in July of 2005 and again in April of 2006. There's the actual, our specific argument here is that the actual trading of commodity futures contracts, okay, and the integrity of the markets on which that trading occurs was a primary focus of Congress in 1974 when it enacted the Commodity Exchange Act, a precursor of the Commodity Exchange Act, and established the CFTC as a federal regulatory agency. If I were to summarize all the arguments that we made in our motions for summary judgment before the district court into two sentences, they would be as follows. There is a difference between trading and investing. The act of... Yes, Your Honor. I will address that in my argument. The difference, there's a difference between trading and investing. The act of trading necessarily includes the concept of investing, but the concept of investing does not necessarily require the act of trading, and the history of the Commodity Exchange Act shows that that was always a concern of Congress, was the actual trading and the integrity of the markets in which that trading occurred. Now, what we pointed out, a perfect example of the difference is the Commodity Shasta Capital Associates, the alleged commodity pool in the current appeal. The members of Shasta invested with Shasta with the expectation of gain, and when they invested with Shasta, they executed an operating agreement which severely restricted their ability to transfer or dispose of that membership interest in any way. They were invested in Shasta for the long term. Shasta did exactly what it told its members it was going to do. It invested in the Entity Tech, the trading company. It didn't invest all of it, it kept some of it on the side, didn't it? It invested all except the 1% that it told its members it was for administrative purposes. Yes, Your Honor. So it did exactly what it told its members it was going to do, invest in the Entity Tech. It did exactly what every other entity and individual did. It was a victim of the fraud perpetrated by Coit Murray and his company, Tech Traders, Inc. What's interesting is of all the other entities that invested in Tech, only the Commodity Pool, Shasta, was alleged to be a commodity pool. The Entity Shasta was alleged to be a commodity pool. There were a number of 20, 30 different entities. The record's unclear exactly how many. There were many, many entities that were investing directly in Tech. Shasta was just one of them. As we pointed out to the District Court again and again in our motions, in every instance in which a commodity pool has been found to exist by the federal courts, without exception, that commodity pool entity has been directly and intimately involved in the actual trading of Commodity Futures contracts. Well, that might just tell us, though, that that's the typical case. Where does the statute require that directness or the regulations? Well, what we're pointing to is the interpretation of a statute, which is the Lopez case, the Ninth Circuit Court of Appeals. Well, but Lopez, we had all those individual accounts, right? That was factually distinct from what Shasta was doing, correct? That's true, but there was trading. And that's the point that we make in our brief, that in every instance in which a pool is found to exist, there's trading by the pool entity. That's what the operator does. The operator trades on behalf of the pool. But there's always been, in every instance in which the federal courts have ever found that a pool exists, that pool entity itself has been actually and intimately involved in trading. But there aren't that many cases out there, are there? No, there are not. So I guess I'm challenging you by suggesting to say that if you have three dogs and they're all cocker spaniels, I'm not sure that means that all dogs are cocker spaniels, right? I mean, let's focus on the language of the... We're Portuguese water dogs. I mean, why does the language of the law that applies here not allow for the agency to have jurisdiction over someone who is pooling assets, and then under contract, it includes a profit-sharing agreement transferring those assets to tech? Well, what we would point to is that four-part test of Lopez, since, as Lopez pointed out, until Lopez really consolidated all prior federal case law, it pointed out that no one had really set out to define exactly what a commodity pool was. And so when Lopez looked at that issue, it said it went to Heritage, it went to Meredith, and a number of the other cited cases, and it said these are the four elements because Congress never defined a commodity pool. It only defines what a commodity pool operator is. And we see in the appellant's argument it attempts to fit the end of the equity into that statutory definition, but it ignores the issue of whether or not a pool exists. It doesn't even list that as an issue in its appeal. And so the issue is, can you have an operator of a pool in the absence of a pool? And we say, no, you cannot, because an operator doesn't exist in a factual vacuum. Do you agree that Lopez never addressed the distinction between direct and indirect trading? I absolutely agree, because indirect trading is a fictitious concept. It's a figment of the appellant's imagination. It's like you're either engaged in the activity described by the verb or you're not. You're either trading or you're not trading. It's just like eating. You're either eating or not eating. According to the appellant, if there's such a thing as indirect trading, if I watch someone eating or if I'm thinking about having a meal later, am I engaged in indirect eating? There's no such thing as indirect eating, nor is there such a thing as indirect trading. But if I hand someone the spoon and they put the food into my mouth, am I still not eating? That's the argument that we're going to hear from the other side. No, someone is assisting you to eat, but you're still eating. So this indirect trading concept really doesn't exist. What we're saying is that in every single case, whenever a commodity pool has been found to exist by the federal courts, that trading has occurred by the pool entity. Is there any case, say, the contrary? No. No, Your Honor. Going back to Judge Hardiman's question, there aren't all that many cases. There are no cases for your proposition. There's very little law, and this is why I think it's a significant case, because you're really presented with this issue now in context. Does trading by the pool entity, is that required in order for a commodity pool to exist? Clearly, and what we pointed to is in the Lopez case, cites the heritage. And in heritage, the CFTC's own expert witness, Charlotte Ulmler, was describing what a commodity pool operator does, and we point that out in our brief. What Ms. Ulmler said, and she was called by, well, Ms. Ulmler was called and she said, what she said is that what the operator does is he first puts the pool's money in a bank account, and then he goes to a brokerage firm. Not just any brokerage firm, but a brokerage firm designated by the CFTC as a Futures Commission Merchant, or FCM, and then opens a trading account. Not just any trading account, but a commodity futures trading account in the name of the pool. On that point, why didn't Shasta have its own bank account? It did. No, it didn't. The money went to you. Didn't the money go to the escrow account of its attorney? I was the attorney. A sub-account of my escrow account was Shasta's account. It was in Shasta's tax ID number. It was Shasta's account, but it was a sub-escrow account of my attorney account. I don't understand. Why did the money that the investors put into Shasta go into your escrow account? The reason for that was I was very concerned that those funds go only where they were supposed to go, which they did. In other words, the funds went into my escrow account, and I reviewed and made sure that the operating agreement and all the other subscription documentation had been executed properly. Then I knew that those funds were only going to the trading company tech. They weren't going anywhere else. Am I wrong that the reports that came out to the investors were inaccurate? They showed that they were making money when in fact they were losing it. Is that wrong? No, that is not wrong, Your Honor. That's exactly what happened to CPA who was hired by tech. Was that Teague? No, no. Teague was Shasta's CPA. Teague received the verification from Abernathy, who was tech CPA. See, there were a number of assumptions that were made in this case by the appellants, by Shasta's members, and also Elaine Teague. And one of those assumptions was is that Vernon Abernathy, a registered CPA in the state of North Carolina with an excellent resume and no prior association with the entity tech, was able to simply compute a simple rate of return computation based upon brokerage statements. That was the first assumption we made that was incorrect. The second assumption we made that was incorrect was that Vernon Abernathy would continue to apply agreed-upon procedures that he told Ms. Teague in their conversation previously that he would apply on a consistent basis, that he would continue to apply those as his letters on his letterhead were certifying to her month after month after month. Okay. If your position prevails here, it means that somebody in Shasta's position that allows somebody else to execute all of their trades is not covered by the Act. Is that correct? If we should prevail, and I think as I was answering your question, I was pointing out before to your question, Judge Slaviter, when Charlotte Ulmer, her final point she was making in addition to putting the funds in a trading account, a commodity future trading account, she said, it's in the name of a pool. She used the phrase, in the name of a pool, in her testimony. It's not a coincidence or accident, but the phrase, in the name of a pool, is found in Ms. Ulmer's testimony and also in the Fourth Test of Lopez. I think that's the intention. Clearly, our point is that if an entity does not have a trading account in its name per the Fourth Test of Lopez and per the CFTC's own expert witness testimony about what a CPA does, then that entity is not a commodity pool. All right. Good. We'll have you back on rebuttal. Mr. White. Good morning. May it please the Court. I'm Martin White representing the Commodity Futures Trading Commission. The appellants in this case, I think it's unquestionably, set up a pooled investment vehicle for the stated purpose of acting as a feeder fund channeling participants, technical term, customer money to a trading company for the purpose of trading in futures contracts. They attracted customers by making misleading or false statements about the profits that the customers would earn trading futures contracts. They retained customers by distributing or fabricating, to use a loaded term, but probably accurate, misleading and unsupported performance data about the results of trading futures contracts. And they arranged with the trading company itself to take a portion of the money that was supposed to be used trading futures contracts and channel it back to appellants through an offshore trust. More than one percent, because I asked him that question and he said the only amount that wasn't invested was one percent. Yes. Well, what happened is the, I think, I believe one percent directly, you know, was taken immediately off the top and went to operating costs. However, of the money that was then sent to tech traders, a substantial portion, order of magnitude ten percent, I don't know, that's not exact, was then sent to a trust in Nevis, pursuant to an arrangement between the appellants here and tech traders. Reading the briefs, I wondered whether the commission had brought in the Department of Justice for a possible criminal investigation. In this case, I do not believe so. I don't want to, I believe there is some continuing litigation on this and there was also settlements with. Everybody but the three that appealed. Right, yes, yes. And I don't want to, let's take it as no, but I should send you, I should check that and make sure I'm right about that and submit a World Trade letter. Well, I just, it seemed sort of criminal to me. Well, there's always, you know, resource judgments and things like that. Okay, thanks. I'm sorry, I didn't mean to dive very deep. Oh, it's certainly relevant. And of course, now, see, that's the basic factual setting. The legal issue, of course, is whether a feeder fund, I think to be more precise, whether the operator of a feeder fund falls within the statutory definition of commodity pool operator. And obviously, first place to look is the statutory language. And the commodity pool operator is engaged in a business in the nature of an investment trust syndicate, similar enterprise. In other words, you've set up a pooled investment vehicle of some kind. The particular form is immaterial. And then the key language of the definition, the operator is the person who solicits, accepts, or receives funds from the participants. And then for the purpose of trading futures contract, the last provision, of course, to make sure it's the kind of business the CFTC should be involved in and not, you know, real estate authorities or something like that. And I think there are two important aspects of this definition. First, there is a requirement that the ultimate purpose of the money be to trade futures contracts. No doubt about that. But there is no specification of who in particular has to trade futures contracts. And in fact, in practice, there are a variety of ways it's done. Sometimes the pool itself is essentially a passive entity. It's essentially required to be a separate segregated pool of money to reduce the chances of the operator playing games with other people's money. But otherwise, the pool is generally passive. The operator, by definition, is the guy who sets up the pool and aggregates the money. The operator may, in some cases, direct the trading or may not. That's one way of doing it. A very common way of doing it is the operator. There's a reference in the brief you've seen to the statutory category of commodity trading advisor. Sometimes the operator will contract with a separate entity whose license is a commodity trading advisor to actually pick the trades. And the third way of doing things, which has become common business practice probably in the 1990s, at least that's when the CFTC's regulations cited in the brief started directly addressing it, is to act as a feeder fund in which the fund that collects the money then passes the money on to a second entity that further aggregates the funds and actually does the trading. And, again, these are all different ways of ensuring that the funds are solicited, accepted, or received for the purpose of trading futures contracts. And I think it's striking that in this particular statute the key definitional language, the focus put by Congress, is not on the pool. It's on the operator. That's the regulated entity. And the key task that the operator performs is soliciting, accepting, and receiving money from the customers. And I think there's a reason for this, which is reflected in the legislative history, and that is that in this particular part of the Commodity Exchange Act, the legislative history shows that Congress's particular concern was protecting unsophisticated, unsuspecting, I think is the word we quote from the legislative history, customers from being enticed into the market. Now, there are plenty of provisions in the Commodity Exchange Act that focus on trading. There are provisions that require trades to be recorded in writing. There are provisions that bar manipulation. There are provisions that bar so-called wash sales. However, when Congress elected in 1974 to regulate commodity pool operators, the particular concern was protecting customers from the operator who was taking their money. And as I think this case illustrates, an operator who does not personally do the trading is perfectly capable of committing the various evils that Congress was trying to deal with in the statute. You know, if you look at the provisions in 11 U.S.C. Section 6MNO dealing with commodity pool operators, there's an anti-fraud provision. And again, it's obviously this case illustrates. Why isn't the attenuation or the alleged attenuation or the indirect nature a problem in your argument? I think, well, there's a legal reason and a factual reason. Good. Okay. The legal reason is simply the statute does not require the operator of the pool to be the guy who trades the contracts. Okay. So that's – and then the factual reason is if you look at the way these people did business and the documentation of the way they did business and the representations they made to the customers, there really wasn't attenuation or I guess there was sort of organizational attenuation. They had a contract with tech traders that said specifically, we recognize that you guys are supposedly experts in trading futures and we're going to be feeding you money so you can make our customers lots of profits trading futures. I should probably add the word purportedly to all this. Their representations in the private placement memorandum, the basic sort of legal document that underlies the soliciting of funds to be placed in the pool, said the purpose explicitly to the customers that we're doing this to take your money and give you this wonderful opportunity to have your money fed to a trading company who has expertise in trading futures, et cetera, et cetera. And the advertising on their website and the information they passed on to other websites made very clear that the purpose here was to trade futures. Now I think you can see – I think where attenuation would come in is if you had circumstances where you could not establish, where there was a chain of companies and it was not possible to establish that the purpose of the business was, or the purpose for which funds were solicited, to pin down the statutory language, is to trade futures. And that's a factual question. Because they thought tech traders were going to buy fixed income securities or something and they got statements saying that that happened and then later found out that in fact they were playing the futures market. As the government, I'm always hesitant to commit to what would not be a law violation. But certainly that would be factually relevant. In the first instance, we and then the courts would have to parse that through the term purpose in the statute. But I think this is – But here it was futures all day, all the time. Correct. I think you're nowhere near the line. And so I think it's probably better not to address the line. But I think the principle here is that the way the statute is written, the key term is purpose as opposed to the way trading is organized. That there's a recognition here that either for good business reasons or as a result of attempts to evade the statute, futures can get traded in a lot of organizational contexts. And so rather than trying to define all possible structures, we focus on the purpose. Congress focuses on the purpose. And I guess that leads without – and again, the obvious practical concern here is that if you had the interpretation proposed by the appellants, it would be very easy to evade the whole statutory scheme that's set up because you could set up – Again, it's slightly loaded but probably accurate term. And then you go find your buddy who can set up a pool to trade futures and you make an arrangement just as the appellant here made their arrangement with Mr. Murray, the principal of tech traders. And again, you still might have to worry about wire fraud or something like that, but you would at least not have to worry about registering with the Commodity Futures Trading Commission and all the consequences that Congress put in place through the registration scheme in an effort to avoid the kind of behavior that took place here. So is it your position that Shasta should have registered – was required to register? Yeah. Well, again, the focus of regulation is the operator. So the – again, the – What's equity? That equity is the operator, and they are the entity that was – in addition to committing fraud, was required to register. So again, so that – and that's important because Congress didn't just have an anti-fraud provision here. They had written in prophylactic provisions, primarily registration, into the law. And that's what the appellants here were trying to evade. Now, what was the relationship between equity and Shasta? Shasta was the pool, which is – again, if things were done right, the pool would be a separate – essentially a pool of money. It could be organized legally in any one of a number of ways. It could be organized as a trust, as some sort of limited liability corporation, a variety of ways of doing it. But you have the pool, and then there is a separate entity, essentially a management company, who is defined – which is equity finance here. And they fall in the – and it's the management company, the company that aggregates the money, who is defined as the commodity pool operator and is required to register. Now, factually, what was the relationship? I mean, Shasta was owned by Firth, is that right? That's correct. A hundred percent owned by Firth. I believe that's right. And who – was equity a corporation? Yes, equity, I believe, was a separate corporation. And who owned it? No, I believe either Mr. Firth or Mr. Firth and Mr. Shimer and set it up. And then now what – It wasn't a subsidiary of Shasta or anything? No, it's a separate company, and I guess – I don't think this is directly relevant to the case. But normally the relationship between the pool and the pool operator would be, I guess, essentially kind of contractual. The pool operator – So equity was the pool operator, not Shasta? Yes, correct. Shasta is the pool and actually is technically not regulated or not directly regulated under the statute. I mean, in practice, it gets regulated. Equity is the pool operator. That's the person who has to register. And then Mr. Firth and Mr. Shimer technically were controlling persons of the pool under – I guess it's 11 U.S.C. section 13B. And since they were controlling what happened, then pursuant to 11 U.S.C. section 13 – 13C without a parenthesis, paren B. Okay, 11 U.S.C., 13C, paren B. They were controlling persons, which then makes them liable for the actions of the company that they control. And that was Firth and Shimer? Firth and Shimer. And then they also had a – they were also under the statute what's called associated persons of equity finance. And in the capacity of – again, it was a technical defined term under the act. In the capacity of associated persons, they themselves were required to register as individuals. Is there any case that sets one that out? We have to look at the statute? Yeah. Is there any decision of a court that sort of sets out all of what you're telling us? Not – I probably shouldn't have the answer to that. I don't – that lays out the whole statutory scheme. It would have to be adventitious. I mean, I can't think of a case where there had to be a holding on the whole statutory scheme. There might be a case out there where some thoughtful appellate judge undertook to write or put in a little treatise on how the whole scheme fits together. Not that I can think of off the top of my head. Other than the fact that Lopez involved individual accounts, is there anything else you want to say about Lopez? Yes. Well, I think the language in Lopez that they rely upon says you need to trade in the name of the pool rather than in the name of the individual customers. And therefore, that really hits home that that's what the – that's the issue the Ninth Circuit was focusing on in that case. And, I mean, not only did they not have a feeder fund in front of them, I think they weren't even thinking about feeder funds. So Lopez is essentially irrelevant. Yeah, it's irrelevant. Essentially irrelevant. That's correct. They were dealing with a particular class of problems. That's not the problem in this case.  Mr. White, thank you very much. Thank you. Mr. Scheimer? Yes, I'd like to correct a number of factual inaccuracies as well as address the legal – the primary legal issue which is really presented to you for decision today. Number one, there was no fabricating going on as far – the reason we're here today really is not because of a lack of registration. I mean, the record indicates that we said if we'd made an error about registering, we're more than happy to do that. And I think the record indicates we hired the former director of enforcement to tell us that and go ahead and register. We weren't concerned about that. If registration had to happen, fine, let it happen. Our concern was that the numbers were correct. And what we had in place was the CPA purportedly was able to verify those numbers. No fabrication was going on because we only reported to our members exactly the numbers that were reported to us through Shasta's CPA. No one was fabricating any numbers that we were going to return. Once that – By the way, aren't you here for Shasta? I'm on behalf of Equity Financial Group, the operator, because as Mr. White pointed out, the only entity that's regulated under the statute is the operator. If you look at the legislative history, as he was discussing too, you'll see that Congress clearly expected the operator to be directly involved in trading because he's trading on behalf of the pool. Is Equity still in existence? No, it's not. It's just a shell now. Is Shasta still in existence? No, Your Honor. No. So what would you just – you started by saying if the problem is registration, we will register. But who is the we who will register? Well, I mean Shasta, my client, Shasta. Equity would have registered as a commodity operator if that were necessary. And we went to legal counsel and said, if we've made a mistake, let us know and we'll register. That's not the problem why we're here. The problem why we're here is because the CPA hired by the trading company failed to accurately report what was actually going on with the trading. That was conveyed to us, and we simply reported that to our members. Now, so there's been a lot of – The reason we're here is because many, many millions of dollars were lost. Absolutely. If many millions of dollars had been earned, we wouldn't be here in all likelihood. Exactly. Usually the regulators are focused on the folks that lose the millions of dollars. Absolutely, Your Honor. And if I could turn back the hands of time and walk away from Mr. Murray and his company, clearly we would have done that. One of the points I'd also like to make on the legal issue – One minute. So your suggestion is that there was no improper actions by Firth and Shimer, but Mr. White told us that 10 percent was set aside in Nevis, and reading the briefs, one gets the feeling that was a playground. Is that right? I mean, was 10 percent set aside, and did Mr. Firth and Mr. Shimer have anything to do with that? Let me address that question because it's an important one. It's a factual question, which is, of course, relevant if the entity, Equity, had to register as a commodity pool and didn't and violated the Act. But as a factual question, basically there was no money going to Nevis. It was an offshore trust that was created not by Mr. Shimer or by Mr. Firth, but by an attorney in Nevis. The trustee was not Mr. Shimer or Mr. Firth. It was a trustee in Nevis, and the beneficiary of the trust was neither Shimer nor Mr. Firth. Did Mr. Shimer and or Mr. Firth have anything to do with the Nevis situation? Did they go to Nevis? Did they sit on the beaches there? Well, yes, Your Honor. We did go to Nevis and talk to those people about that possibility of setting that up, but there was no funds going to Nevis. There was no account on the name of the trust. All funds remained with TechTraders, Inc. There was no separate bank account set up in Nevis to funnel funds out of this fund. So who was responsible for all these fraudulent statements that Judge Hardiman noted caused the losses, millions, millions of losses? Well, exactly, Your Honor. What happened was that a CPA local to the trading operation was hired by the trading company and that CPA had an excellent resume. You're talking about Abernathy? Mr. Abernathy had no prior association with Mr. Abernathy, and in discussions with Where did the money go? I'm still trying to find out. Millions of dollars were taken from investors and got lost. Now, who had that money? Well, Mr. Murray and his trading company because that's where all trading occurred. All money stayed with Mr. Murray. That's where the funds were traded, and if there's money missing, it's because the receiver in this matter was not able to discover what Mr. Murray did with those funds. Every single penny that went through Shasta was matched to the penny. There was never any misappropriation with respect to Shasta or the accounting of Shasta. And what I'd also like to point out here is in this focus on the statutory definition of commodity pool operator, I alluded to this before, it's true. First of all, Congress intended that the operator trade, and that's clear in the legislative history. So if equity is a commodity operator, why isn't it trading? Statute doesn't say that. Statute, I mean, if you look at the legislative history. Statute says for the purpose of trading. If the words for the purpose of were not in the statute, you'd have a better argument, wouldn't you? Well, no. I think in the definition of pool, for example, the previous definition was one that actually engaged in trading. Pool is not defined by the statute. That's correct. Pool is defined in the regs. That's correct. But a pool operator is defined by statute, and it says for the purpose of trading, which implies, I think, pretty clearly that you could hire someone else to do the trading for you as long as you solicit, accept, and pool this money for the purpose of trading. I think our primary argument here would be that clearly Congress has a statutory definition of the operator without defining the pool. Lopez defines the pool. And what we're saying, how can you possibly have an operator in the absence of a pool? How can you have a commodity pool operator? It's like saying, it's like the proverbial cart and the horse. The horse is not relevant to the cart. Of course it is. That's what the operator does. He operates a pool. And so what we're saying, the pool has to be found. We understand your position. Thank you very much. I think it would be helpful for the court to have a transcript of this argument as well. And I would ask you to share in the cost of that, please, and check with the clerk's office. The court will take the matter under advisement.